**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **ECO-STIM ENERGY SOLUTIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO. 17-2531** |
| **TED MCINTYRE, II, TURBINE POWERED TECHNOLOGY, LLC, MARINE TURBINE TECHNOLOGY, LLC, AND MTT PROPERTIES, LLC,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## ORIGINAL COMPLAINT

Plaintiff Eco-Stim Energy Solutions, Inc. ("EcoStim") files this Original Complaint against Defendants Ted McIntyre, II ("McIntyre"), Turbine Powered Technology, LLC ("TPT"), Marine Turbine Technology, LLC ("Marine Turbine"), and MTT Properties, LLC ("MTT Properties") (singly or in combination, "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.      This case arises from repeated false and threatening communications from Defendants—led by McIntyre—to EcoStim, as well as its board members, executives, employees, shareholders, and investors.  But Defendants' allegations are not merely false—they are frivolous.  Through letters and other correspondence discussed in this Complaint, Defendants have accused EcoStim of stealing what it rightfully purchased, with Defendants' complete knowledge, participation, consent, and authorization.

2.      As discussed in this Complaint, Defendants have accused EcoStim of stealing their "intellectual property" by, *inter alia*, infringing U.S. Patent No. 9,429,078

("the '078 patent"), which Defendants allege "relat[es] to digital engine controllers that are compatible with turbine engines," and alleged trademarks related to "CRUZFRAC" (Serial No. 85907104; Registration No. 4724316).

3.      Even a cursory examination of the facts puts the lie to Defendants' allegations.   To put it simply, EcoStim uses neither the alleged "CRUZFRAC" mark nor the turbine engine controller technology Defendants claim to own.   But even if EcoStim were to use any such technology, EcoStim's use would be permissible—as Defendants clearly and unambiguously guaranteed EcoStim in writing, as described below.

4.      EcoStim purchased the allegedly infringing equipment—including the accused turbine engine controllers—from the sales agent of Green Field Energy Services Inc. ("Green Field"), a bankrupt TPT-affiliated entity to which TPT was also a creditor. McIntyre and TPT were actively involved in the equipment sale.   For instance, to help finalize the sale, Defendants made multiple trips to Houston to negotiate a written freedom-to-operate assurance that not only is an enforceable agreement but also was a prerequisite to EcoStim's purchase of the equipment.   The freedom-to-operate assurance guarantees EcoStim that it may operate the purchased equipment "as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property." The assurance—attached as Exhibit A—is written on TPT's letterhead, signed by TPT's General Counsel, and copied to McIntyre.   Notwithstanding their guarantee to the contrary, Defendants have on multiple occasions wrongly accused EcoStim of misappropriating alleged "intellectual property" relating to turbine engine controllers, even though EcoStim continues to use the very same turbine engine controllers that it purchased subject to Defendants' freedom-to-operate assurance.

5.      EcoStim is in the oil-field services business.  EcoStim owns and uses trailers outfitted with turbine-powered pumps that produce the high-pressure liquid flow necessary in hydraulic fracturing (sometimes referred to as "fracking") operations.  Several of EcoStim's turbine-powered hydraulic fracturing pump trailers are the equipment that EcoStim purchased from a TPT-affiliated group (the "Green Field Equipment").  McIntyre and TPT aided that sale process and provided Defendants' freedom-to-operate assurance to induce the sale.  At the time they were purchased, EcoStim's Green Field Equipment incorporated two separate and distinct controllers:  a turbine engine controller and a pump controller.  That remains true today, although EcoStim has refurbished some of the Green Field Equipment with new pump controllers.  All of EcoStim's Green Field Equipment retains its original turbine engine controllers.

6.      Arizona Turbine Technologies, Inc. ("AZT") and EcoStim have a business relationship dating back to the summer of 2015.  EcoStim's relationship with AZT began when AZT won a bidding process against Defendants to refurbish some of EcoStim's Green Field Equipment.  On information and belief, and as best can be understood from Defendants' vague allegations, Defendants' loss in the bidding process and EcoStim's resulting relationship with AZT spawned Defendants' campaign of false and threatening allegations.

7.      The EcoStim/AZT relationship includes a services agreement signed in August 2015.  Under that agreement, AZT replaced the pump controllers—but not the turbine engine controllers—for some of EcoStim's Green Field Equipment.  EcoStim's use of the original turbine engine controllers (as well as its use of refurbished pump controllers) falls squarely within the scope of Defendants' freedom-to-operate assurance.

Given that Defendants' purported "intellectual property" relates to turbine engine controllers, their allegations of "intellectual property" theft are fundamentally misguided. At bottom, Defendants have accused EcoStim of stealing turbine engine controller technology that EcoStim rightfully purchased—subject to Defendants' freedom-to-operate assurance, no less.

8.      Despite all of this, for months now, Defendants have attempted to interfere with EcoStim's business operations and relationships, including EcoStim's relationship with AZT.  Defendants have sent repeated, false, and threatening communications to EcoStim board members, executives, employees, shareholders, and investors.  In these communications, Defendants have claimed that using turbine controllers EcoStim allegedly purchased from AZT—but in fact purchased part and parcel of the Green Field Equipment—amounts to theft of Defendants' "intellectual property."  On information and belief, Defendants either knew these allegations were false or acted with reckless disregard for their truth.

9.      Defendants' motives are obvious.  They want EcoStim to aid them in their quest to remove their competitor AZT from the market for electronic turbine and pump controllers and related services by bullying EcoStim into discontinuing use of AZT as a contractor.

10.     Notwithstanding the flurry of accusations, Defendants have no viable claim against EcoStim.  Recognizing as much, Defendants have repeatedly resorted to vagueness, lobbing non-specific allegations of theft of unspecified "intellectual property" purportedly owned by Defendants.  Defendants' communications have variously suggested this "intellectual property" might include patents, trademarks, trade secrets, or something else.

Defendants have even wildly suggested, without any support whatsoever, that EcoStim is involved in criminal wrongdoing.

11.     Even setting aside the fact that EcoStim purchased the Green Field Equipment, including its turbine engine controllers, from a TPT-affiliated group with McIntyre and TPT's involvement, authorization, and consent—and the fact that those controllers are subject to Defendants' freedom-to-operate assurance—Defendants' allegations of "intellectual property" theft are baseless. Sworn pleadings in Louisiana federal court plainly explain why AZT's products cannot infringe the '078 patent.  As noted in the amended complaint in that case—on behalf of an inventor of the '078 patent, among other plaintiffs—AZT's products are fundamentally different from the technology claimed in the '078 patent.  *E.g.*, Dkt. 46 ¶¶ 34-49, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC*, No. 6:17-cv-00386 (W.D. La. June 28, 2017).

12.     As to Defendants' alleged trademarks, EcoStim does not use the alleged "CRUZFRAC" mark. To the best of its current knowledge, EcoStim has never used "CRUZFRAC" or any similar name to market or otherwise designate its products and services.

13.     As to Defendants' alleged trade secrets, an Arizona federal court confirmed that Defendants have none, in a case involving the original manufacturer of several of EcoStim's turbine engine controllers. *See* Dkt. 129 at 18-19, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech.*, No. 4:14-cv-01868 (D. Ariz. Mar. 31, 2016).  This holding is buttressed by McIntyre's admission in a Louisiana state court hearing that his purported trade secrets are not even secret, as they are publicly disclosed in patents. *E.g.*, 6/15/17 Hearing Transcript at 189:25-190:10, 196:2-197:7, 212:19-214:32, *Turbine Powered*

*Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary.  McIntyre even agreed under oath that the "source of [his] intellectual property is … patented" and that his alleged trade secrets are protected by patents:  "[s]o that took technology that was developed in-house, trade secrets, if you will, protected by NDA's and trademarks and ultimately, the patents that we know were assigned to us and we control that was all derived from all of our work product."  6/15/17 Hearing Transcript at 189:25-190:10, 214:19-24, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary (emphasis added).

14.     According to McIntyre's own sworn testimony, the scope of Defendants' alleged "intellectual property" is so vast as to preempt an entire field of industrial enterprise that has been well-known for decades.  McIntyre testified that "[t]he trade secrets are controlling turbine engines."  6/15/17 Hearing Transcript at 195:28-29, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary (emphasis added); *see also id.* at 192:7-12 (testifying that trade secret is "controlling a turbine engine for hydraulic fracturing power generation" (emphasis added)).

15.     But Defendants do not possess a trade secret that covers the broad, abstract concept of "controlling a turbine engine" generally or "for hydraulic fracturing power generation" more specifically.  Not only have these ideas been well-known and in practice since at least the 1960s, but patents that McIntyre referenced in his testimony publicly disclose those very concepts—and more.  *E.g.*, '078 patent at 16:46-55 (noting that "the architecture of FIGS. 3-4 may be applied to the task of digitally controlling a pump-engine assembly, and namely, a gas turbine engine and a pump" and "[t]he pump may be used for

6

various applications, with one example being injecting fluids and/or semi-fluids into the ground during hydraulic fracturing operations"). This public disclosure of Defendants' purported trade secrets in a patent—a patent on which McIntyre is not even listed as an inventor and that describes ideas well-known since at least the 1960s—erases any doubts about Defendants' trade secrets. They have none.

16.     EcoStim does not bring this case lightly—it has no desire to burden the Court or anyone else with unnecessary litigation. However, it has become clear that without redress from the Court, Defendants' baseless, threatening allegations will continue unabated and continue to damage EcoStim's business.

## THE PARTIES

### A.     EcoStim.

17.     Plaintiff Eco-Stim Energy Solutions, Inc., a Nevada corporation, has its principal place of business at 2930 W. Sam Houston Pkwy N., Suite 275, Houston, Texas 77043.

18.     EcoStim is an independent energy-services company offering a variety of services, including geophysical prediction, pressure pumping, and coiled-tubing.

19.     Specifically relevant to this case, EcoStim provides hydraulic fracturing services, including those that use turbine-powered hydraulic fracturing pumps.

20.     Founded in 2012, EcoStim brings both state-of-the-art equipment and technological expertise to each of its projects, allowing EcoStim to provide its customers with a complete package intended to minimize costly trial and error, lower production costs, reduce water usage, and reduce environmental impact.

**B.      Defendants.**

21.      On information and belief, Defendant Ted McIntyre, II is a person of full age of majority, domiciled in New Iberia, Louisiana.

22.      On information and belief, Defendant Turbine Powered Technology, LLC, is a Louisiana limited liability company with its principal place of business in Franklin, Louisiana.

23.      The Louisiana Secretary of State website lists TPT's registered agent as McIntyre.

24.      TPT previously registered with the Texas Secretary of State to do business in the State of Texas on September 6, 2012, and holds a Texas taxpayer number of 32048947264.

25.      On information and belief, Defendant Marine Turbine Technology, LLC, is a Louisiana limited liability company with its principal place of business in Franklin, Louisiana.

26.      The Louisiana Secretary of State website lists Marine Turbine's registered agent as McIntyre.

27.      On information and belief, Defendant MTT Properties, LLC, is a Louisiana limited liability company with its principal place of business in Franklin, Louisiana.

28.      The Louisiana Secretary of State website lists MTT Properties's registered agent as McIntyre.

29.      As used herein, "MTT" refers to one or both of Marine Turbine and MTT Properties.

30.     TPT was incorporated in 2011 and operated as a joint venture of Green Field and MTT Properties.   On information and belief, MTT Properties was acting on behalf of McIntyre or MTT.

31.     Defendants are in the business of, among other things, selling repurposed gas turbine engines for use in products such as airboats, generators, firefighting equipment, and pumping equipment.

32.     Defendants have done business in this District for years.   For instance, Defendants repeatedly visited EcoStim's Houston offices when EcoStim was contemplating purchasing the Green Field Equipment.   These meetings included discussions regarding the freedom-to-operate assurance provided by Defendants to EcoStim, without which EcoStim would not have purchased the Green Field Equipment. Defendants have also been to EcoStim's Houston offices to participate in the process of bidding to refurbish the pump controllers on EcoStim's Green Field Equipment.

33.     Defendants have conveyed multiple communications to EcoStim within this District.   Some of those communications related to EcoStim's purchase and refurbishing of the Green Field Equipment, discussing, for instance, the freedom-to-operate assurance and the bidding process.   Other communications Defendants sent EcoStim in this District contained false and threatening allegations that form a basis for the claims EcoStim presents in this Complaint.   Given that Defendants have undertaken the actions that form the basis of this Complaint in Texas and, more particularly, in this District, Defendants are subject to the jurisdiction of this Court.

34.     Defendants also have subjected themselves to the courts located in Texas, and more specifically in this District, by doing business with customers and potential

customers here, including business related to turbine-powered hydraulic fracturing pumping equipment. In particular, Defendants have been involved in the sale of the Green Field Equipment to EcoStim in this District and have further attempted to sell EcoStim related goods and services in this District. Defendants' contacts with the State of Texas and this District are both specifically related to the claims EcoStim presents in this Complaint and also sufficiently continuous and systematic so as to subject Defendants to the general and specific jurisdiction of all courts located within the State.

## JURISDICTION AND VENUE

35.     This action arises under the Patent, Trademark, and Trade Secret Laws of the United States and the Declaratory Judgment Act based on an actual justiciable controversy between EcoStim and Defendants. This Court therefore has subject matter jurisdiction over these claims under one or more of 18 U.S.C. § 1836 and 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

36.     This Court additionally has subject matter jurisdiction over these claims under 28 U.S.C. § 1332, because the parties are diverse in citizenship and the amount in controversy exceeds the jurisdictional minimum.

37.     This Court further has supplemental subject matter jurisdiction over the pendant state law claims under 28 U.S.C. § 1367.

38.     This Court has personal jurisdiction over each Defendant.

39.     Defendants, led by McIntyre, have attempted extra-judicial enforcement of alleged patent, trademark, trade secret, and other unspecified "intellectual property" rights against EcoStim within this District, by directing communications, including letters, emails, and phone calls, to EcoStim and individuals associated with EcoStim regarding

Defendants' unfounded allegations of "intellectual property" theft.  These communications form a basis for the claims in this Complaint.

40.     Defendants have been involved in the sale of the Green Field Equipment to EcoStim in this District and have further attempted to sell to EcoStim the goods and services described in this Complaint in this District. In particular, Defendants were involved in the sale to EcoStim of the Green Field Equipment that EcoStim later chose to use with pump control systems provided by AZT.  Defendants were also involved in a bidding process to replace EcoStim's turbine engine pump controllers in some of the Green Field Equipment, but lost that bidding process to AZT.  EcoStim's use of the Green Field Equipment is the ostensible basis of Defendants' false allegations of "intellectual property" theft.

41.     Venue is proper in this District under 28 U.S.C. § 1391 because substantial parts of the events giving rise to EcoStim's claims occurred in this District and because each Defendant is subject to personal jurisdiction here.

## FACTUAL BACKGROUND

**A.     Use of Turbine-Powered Engines for Hydraulic Fracturing.**

42.     For more than fifty years, turbine engines—such as from military helicopters and planes—have been repurposed for use in various industrial applications, including hydraulic fracturing pumps, in the United States and around the world.

43.     For instance, the figure below "shows a two-shaft gas turbine powered pump unit that was placed in field service during 1966."



**Fig. 8.9** Two-shaft gas turbine engine driving a positive displacement pump.

G.C. Howard & C.R. Fast, HYDRAULIC FRACTURING (Henry L. Doherty Series 1970).

44.      These repurposed turbine engines provide adequate levels of horsepower to drive hydraulic fracturing pumps for shale oil and gas production.  Repurposed turbine engines are desirable for these applications due to their efficiency, size, cost, and environmental impact, including the ability to run on natural gas and to meet the EPA's Tier IV emissions limits.

**B.      TES, AZT and David Crowe.**

45.      Tucson Embedded Systems, Inc. ("TES") is an Arizona corporation with its principal place of business in Arizona.

46.      David Crowe ("Crowe") co-founded TES in 1996.

47.     TES is and has been in the business of, among other things, designing, manufacturing, installing, and monitoring custom digital engine control systems, including those for use with turbine-powered hydraulic fracturing pump equipment.

48.     Crowe left TES in 2014 (after TPT filed a lawsuit against TES, discussed below) and founded AZT.

49.     Since 2014 AZT has been in the business of developing turbine engine powered industrial applications.  On information and belief, these industrial applications include turbine-powered hydraulic fracturing.

   **C.     U.S. Patent No. 9,429,078, TES, and TPT.**

50.     While at TES, Crowe's work led to several patent applications, including U.S. Patent Application No. 14/080,944 (the "'944 application"), which was filed on November 15, 2013.

51.     From the '944 application, the United States Patent and Trademark Office issued U.S. Patent No. 9,429,078 (the "'078 patent"), which lists Crowe and Elden Crom as inventors.  The '078 patent is titled "Multi-Compatible Digital Engine Controller."  A copy of the '078 patent is attached as Exhibit B.

52.     The '078 patent issued on August 30, 2016.

53.     The '078 patent discloses broad, general, and previously well-known information about hydraulic fracturing.  Such discussions of previously well-known information include the fact that turbine engine pumps used in hydraulic fracturing operations may have controllers (digital or otherwise).

54.     For instance, the '078 patent states:

In a further example, the architecture of FIGS. 3-4 may be applied to the task of <u>digitally controlling a pump-engine assembly, and namely, a gas turbine engine and a pump</u>, where the engine drives the pump. Here, a

pump-engine controller automatically determines and adjusts inputs to the pump to regulate hydraulic output of the pump to meet user-specified output characteristics despite changing loads on the pump. <u>The pump may be used for various applications, with one example being injecting fluids and/or semi-fluids into the ground during hydraulic fracturing operations</u>.

'078 patent at 16:46-55 (emphasis added), attached as Exhibit B.

55.    The '078 patent was assigned to TES at issuance.

56.    Ownership of the '078 patent has been divided between TES and TPT since an October 12, 2016, assignment.

57.    McIntyre, on behalf of TPT, testified at a June 15, 2017, hearing that, due to alleged contracts, TPT owned the "intellectual property" underlying the '078 patent. 6/15/17 Hearing Transcript at 191:28-192:2, 209:15-21, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary

58.    EcoStim therefore understands that TPT believes it owned the application leading to the '078 patent, and ultimately the '078 patent itself, as of at least the date the '078 patent application was filed, November 15, 2013.

**D.    Green Field's Rise and Fall and the Formation of TPT.**

59.    In 2011, Hub City Industries was renamed Green Field.

60.    For several years, Green Field offered various hydraulic fracturing services, including services that used repurposed turbine engines.

61.    In September 2011, Green Field and MTT formed TPT as a joint venture and, thereafter, jointly owned TPT to support Green Field's hydraulic fracturing services business.

https://www.sec.gov/Archives/edgar/data/1542387/000119312512228720/d349756dex1017.htm.

62.     As part of the joint venture arrangement, Green Field and TPT entered into an "Equipment Purchase Agreement" pursuant to which Green Field had the exclusive right to purchase turbines and accessory equipment from TPT for use in hydraulic fracturing until October 2016.  The Equipment Purchase Agreement further provided a royalty-free perpetual license to use the equipment that it purchased from TPT.  This license, which was assigned to Green Field on or about September 22, 2011, granted Green Field a license to TPT's intellectual property, including patents, trademarks, trade secrets, and copyrights, and specifically extended to Green Field and all third party purchasers who used the equipment for oil and gas well services, including without limitation fracturing services.

63.     Along with the Equipment Purchase Agreement, Green Field also entered into separate installation and maintenance agreements with TPT.  Under these agreements, TPT provided all labor and professional supervisory and managerial personnel required for installation of turbine engines and maintained and repaired certain equipment.

64.     McIntyre executed the Equipment Purchase Agreement on behalf of TPT as its managing member and is listed as the sole member of TPT on the Louisiana Secretary of State's website.  McIntyre testified in a June 15, 2017 hearing that TPT is his company. 6/15/17 Hearing Transcript at 186:9-10, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary.

65.     Accordingly, on information and belief, McIntyre currently controls TPT and has controlled TPT since its inception.

66.     Eventually Green Field faced difficulties and filed for bankruptcy in October 2013.  As of the Petition Date in the bankruptcy, Green Field admitted that it

owed TPT approximately $8,679,668 on account of products and services.  *Id.*  TPT filed multiple claims in the Green Field bankruptcy, including one $3,064,000 claim for breach of the Equipment Purchase Agreement and another claim for $9,440,177.96 for monies owed for services performed, materials, and parts sales.  Marine Turbine also filed a claim in Green Field's bankruptcy.

> **E.    EcoStim's Purchase of the Green Field Equipment and TPT's Freedom-to-Operate Assurance.**

67.    As part of the bankruptcy proceeding, Green Field bid out the opportunity to liquidate its assets and, following the bidding solicitation, on February 7, 2014, Green Field entered into an Agency Agreement with Gordon Brothers Commercial & Industrial, LLC (the "Sales Agent"), to act as the exclusive sales agent in connection with the sale of certain of Green Field's assets, including the equipment ultimately purchased.

68.    Green Field presented the Agency Agreement to the Bankruptcy Court for consideration.  In approving the Agency Agreement and the sale of assets, the Bankruptcy Court found, *inter alia*:

- Time is of the essence in effectuating the Agency Agreement and proceeding with the sale contemplated therein without interruption;

- The sale of the assets must be commenced as soon as practicable to maximize the value from the sale;

- Unless the assets were sold free and clear of any claims or interests, including without limitation licenses, restrictions, or any other encumbrances, it would materially and adversely impact the value that Green Field would be able to obtain for the sale of the assets.

Order Authorizing (A) the Sale of Certain Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances Except for Permitted Encumbrances in Certain Circumstances; (B) the Debtors to Enter Into and Perform Their Obligations under the GBCI Agency Agreement; and (C) Related Relief; In re: Green Field Energy Services, Inc., Case No. 13-12783(KG), Bankruptcy Court, District of Delaware (Dkt. 715, Mar. 14, 2014) ("Sale Order").

16

69.     The Bankruptcy Court ordered that the terms and provisions of both its Sale Order and the terms and provisions of the Agency Agreement, which authorized the Sales Agent to sell assets free and clear of any encumbrances, was binding on all creditors who received notice—including without limitation TPT and Marine Turbine—and their respective affiliates, successors and assigns, "and any affected third parties, including but not limited to, all persons asserting an interest in the Assets…." Sale Order.

70.     McIntyre, on behalf of TPT, received a copy of the Sale Order via First Class Mail on March 2014 at 298 Louisiana Rd., Port of West St. Mary, Franklin, LA 70538-7607 and by email at ted.m@tptenergy.com.

71.     McIntyre, on behalf of Marine Turbine, also received a copy of the Sale Order in March 2014 via First Class Mail at 298 Louisiana Rd., Franklin, LA 70538.

72.     Thereafter, on or about October 10, 2014, EcoStim entered into an agreement with the Sales Agent (the "EcoStim Purchase Agreement") to purchase certain Green Field equipment, including twelve trailers for use in turbine-powered hydraulic fracturing pumping, with each trailer containing two turbine engines (the "Green Field Equipment").  The sale closed on or about October 13, 2014, and required periodic payments by EcoStim totaling $6,500,000 plus interest.

73.     Pursuant to the Sale Order, the EcoStim Purchase Agreement conveyed the assets "free and clear of all liens, mortgages, pledges, security interests, claims, purchase rights, options and other encumbrances ('Liens')."

74.     The EcoStim Purchase Agreement further provided that the consummation of the sale of the Green Field Equipment to EcoStim will not "conflict with or result in a violation or breach of any provision of any contract, agreement, commitment, obligation,

law or governmental order applicable to [the Sales Agent] or the Assets… All approvals of the Bankruptcy Court to sell, transfer, convey, assign and deliver the Assets as contemplated herein have been obtained."

75.     Based on the foregoing, the Sales Agent represented and warranted to EcoStim that it would have good and marketable title to all of the assets it purchased–such as the Green Field Equipment—and that all assets "shall be free and clear of all Liens at Closing."  EcoStim, therefore, reasonably understood from the Sales Agent that it could use and operate the Green Field Equipment free and clear from any claims that such use violated the intellectual property rights of anyone.  EcoStim would not have purchased the Green Field Equipment but for these representations and warranties.

76.     McIntyre and TPT were involved in the sales process that led to the EcoStim Purchase Agreement.

77.     For instance, McIntyre and TPT held themselves out as business associates and licensors of the Sales Agent, with detailed knowledge of Green Field's equipment. EcoStim understood at the time that McIntyre and TPT were involved in the process because they hoped to receive service contracts from the purchaser(s) of the Green Field Equipment.

78.     TPT and Marine Turbine, and McIntyre based on his interest therein, further stood to benefit from the sale of the Green Field Equipment bought by EcoStim, as they were creditors in the Green Field bankruptcy proceedings, and, as such, benefitted from maximizing the funds generated from liquidating Green Field's assets.

79.     At the time of the above-described sale to EcoStim, on or about October 13, 2014, Holdan Hoggatt, general counsel of Green Field's affiliates, TPT and MTT, with

McIntyre copied, provided a written freedom-to-operate assurance on behalf of TPT to EcoStim in Houston.

80.    This freedom-to-operate assurance was critical to EcoStim's decision to purchase the Green Field Equipment.  Without the assurance, EcoStim would not have completed the purchase.  In fact, EcoStim held up finalizing the purchase until it received the assurance.

81.    Before providing the written freedom-to-operate assurance, Defendants attended several meetings in EcoStim's Houston office to discuss details of the assurance.

82.    In the freedom-to-operate assurance—on TPT letterhead, signed by TPT's General Counsel, and with McIntyre copied—TPT made the following promises:

- "To the best of our/TPT's knowledge, after diligent review and inquiry, the Equipment which Eco-Stim intends to purchase from [Gordon Brothers] is not subject to any conflicting license or right of use which would prevent Eco-Stim from using the equipment as contemplated."

- "This letter and the accompanying record proof of the statements herein should assure Eco-Stim that it may operate the equipment as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property."

83.    A copy of the freedom-to-operate is attached as Exhibit A,

84.    In consideration of, and in reliance on these assurances, EcoStim spent millions of dollars to acquire the Green Field Equipment.

85.    TPT has failed to abide by the assurances in its October 13, 2014 letter.

86.    TPT has further failed to abide by the terms of the Equipment Purchase Agreement with Green Field, of which EcoStim is an intended third-party beneficiary, because the Equipment Purchase Agreement specifically provides that Green Field's license permitted it to sell the Green Field Equipment to third parties for use in fracking and other oil and gas field services.

87.     TPT has made and continues to make false allegations of "intellectual property" infringement and misappropriation premised on EcoStim's use of the Green Field Equipment purchased from the Sales Agent, after TPT assured EcoStim that, if it purchased the Green Field Equipment, EcoStim "may operate [them] as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property."

88.     As originally purchased, the Green Field Equipment each included two separate and distinct controllers: (1) a turbine engine controller; and (2) a pump controller. Most of the units were fitted with "iDEC" turbine engine controllers manufactured by TES; a few had different "blue box" turbine engine controls.  Each unit's pump controller was manufactured by Lime Instruments, Inc. ("Lime").

89.     Even though EcoStim has not used the '078 patent, the freedom-to-operate assurance and the Equipment Purchase Agreement would cover any use of the '078 patent by EcoStim.

**F.     TPT Loses Bid for EcoStim's Business.**

90.     After the purchase of the Green Field Equipment, EcoStim decided to replace the original Lime pump controllers on some of the Green Field Equipment that is configured with TES-supplied iDEC turbine engine controllers.  This replacement did not involve any changes or modifications to the iDEC turbine engine controllers; they would remain exactly as they were at the time EcoStim purchased the Green Field Equipment.

91.     To that end, EcoStim solicited bids from various companies, including both TPT and AZT.  After reviewing the bids—and after several visits by Defendants to EcoStim's Houston office to discuss those bids—EcoStim selected AZT for the work.

92.     On or about August 6, 2015, EcoStim entered into a service agreement with AZT, under which AZT would ultimately refurbish the pump control systems on some of

the Green Field Equipment to include AZT's ByRate™ control system for EcoStim's turbine pumps.  AZT was also to integrate its TiDec Realtime Stream into EcoStim's turbine pumps.

93.     AZT refurbished the pump control systems on the turbine-powered hydraulic fracturing pumps in six of the twelve Green Field Equipment trailers.

94.     AZT did not change, modify, or otherwise work on the turbine engine controllers: the turbine engine controllers on EcoStim's Green Field Equipment are the original, unmodified iDEC (from TES) and "blue box" turbine engine controllers that were installed on the engines at the time EcoStim purchased the Green Field Equipment.

95.     To the best of its current knowledge, EcoStim has never used "CRUZFRAC" or any similar name to market or otherwise designate its products and services, including those that make use of the AZT pump controllers.

96.     AZT is currently installing a version of AZT's Turbine Frac Manager ("TFM") on certain of EcoStim's diesel-powered (not turbine-powered) hydraulic fracturing pumps to better enable them to work in combination with the turbine-powered pumps. As EcoStim understands Defendants' vague allegations, they relate solely to turbine-powered hydraulic fracturing pumps, not diesel-powered hydraulic fracturing pumps.

97.     Beyond the August 2015 agreement, there are no contracts between AZT and EcoStim that relate to EcoStim's turbine-powered hydraulic fracturing pumps, including those on the Green Field Equipment.

   **G.     EcoStim's Turbine-Powered Hydraulic Fracturing Operations.**

98.     Each of the trailers that EcoStim acquired when it purchased the Green Field Equipment contains two turbine engines.

99.     EcoStim acquired the Green Field Equipment on or about October 13, 2014, in specific consideration of TPT's freedom-to-operate assurance.  In addition to TPT's freedom-to-operate assurance, the Green Field Equipment is covered by the perpetual royalty-free license afforded to EcoStim as third-party beneficiary to the Equipment Purchase Agreement, because the Equipment Purchase Agreement specifically provides that Green Field's license permitted it to sell the Green Field Equipment to third parties for use in fracking and other oil and gas field services.

100.     Each of the turbine-powered hydraulic fracturing pumps included in the Green Field Equipment uses two separate and distinct controllers: (1) a turbine engine controller; and (2) a pump controller.

101.     Throughout the entire period from the purchase of the Green Field Equipment through today, the turbine engine controller on the Green Field Equipment trailers has been either the original TES-manufactured iDEC or the original "blue box" controller.  Neither AZT nor anyone else has modified the turbine engine controllers that were already installed on the Green Field Equipment when it was purchased by EcoStim.



An Original iDEC, Still Installed Today on One of EcoStim's Turbine-Powered Pumps

102.    To the best of its current knowledge, EcoStim has never had proprietary information, such as computer source code, technical specifications, or design documents, relating to the iDEC turbine engine controllers.

103.    To the best of its current knowledge, EcoStim has never had proprietary information, such as computer source code, technical specifications, or design documents, relating to the "blue box" turbine engine controllers.

104.    The pump controller on the turbine-powered hydraulic fracturing pumps in six of the twelve Green Field Equipment trailers has been the Lime-manufactured pump controller throughout the entire time EcoStim has owned the Green Field Equipment.

105.    To the best of its current knowledge, EcoStim has never had proprietary information, such as computer source code, technical specifications, or design documents, relating to the Lime pump controllers.

106.    The pump controllers in the turbine-powered hydraulic fracturing pumps for the other six of twelve Green Field Equipment trailers were Lime pump controllers at the time of purchase.  The Lime pump controllers have since been replaced by AZT pump controllers.

107.    To the best of its current knowledge, EcoStim has never had proprietary information, such as computer source code, technical specifications, or design documents, relating to the AZT pump controllers.

108.    To the best of its current knowledge, EcoStim has never used "CRUZFRAC" or any similar name to market or otherwise designate its products and services, including those that make use of the AZT pump controllers.

109.    EcoStim is not practicing the '078 patent based on the work done by AZT for EcoStim (or otherwise).  According to Defendants, the '078 patent "relat[es] to digital engine controllers that are compatible with turbine engines."  Exhibit C (January 13, 2017 Greg Mier Cease & Desist Letter).  AZT provided EcoStim with pump controllers to replace the original Lime pump controllers on some of EcoStim's Green Field Equipment.  As far as EcoStim is aware, neither AZT nor anyone else has modified the iDEC and "blue box" turbine engine controllers that were installed on the Green Field Equipment when it was purchased by EcoStim.

110.    Even if EcoStim's use of the Green Field Equipment were to infringe the '078 patent (to be clear, it does not), McIntyre's and TPT's involvement in the sale of the Green Field Equipment would exhaust Defendants' patent rights with respect to that equipment.  Furthermore, having assured EcoStim that it would be able to operate the Green Field Equipment as EcoStim "sees fit," Defendants may not now complain that the

way in which EcoStim sees fit to operate the Green Field Equipment infringes the '078 patent, or any other "intellectual property" rights allegedly owned by Defendants.

111.   Based upon EcoStim's understanding of what Defendants claim to be their trade secrets, EcoStim currently does not have any reason to believe that it has had access to their purported trade secrets (which, to be clear, EcoStim does not believe Defendants actually possess) or any other proprietary information, such as confidential source code, technical specifications, or design documents, that relates to turbine engine controllers or pump controllers for use in hydraulic fracturing.

112.   Although EcoStim had planned to refurbish the other six Green Field Equipment trailers by replacing the Lime pump controllers on each, the unlawful actions of Defendants described below have caused EcoStim to suspend those plans.

**H.     Defendants' Repeated, False, and Unlawful Allegations of "Intellectual Property" Infringement and Misappropriation.**

113.   Defendants, directly or through others acting at their direction, have made repeated, false, and unlawful assertions of "intellectual property" infringement and misappropriation against EcoStim.

114.   EcoStim infringes no valid and enforceable "intellectual property" rights held by Defendants.

*1.     TPT Has No Relevant Trade Secrets.*

115.   On or about February 26, 2014, TES filed a lawsuit against TPT, alleging, among other things: (1) breach of contract; (2) unjust enrichment; (3) intentional interference with TES's business expectancy; (4) copyright infringement and unfair competition; and (5) misappropriation of trade secrets. *See* Dkt. 1, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech., LLC*, No. 4:14-cv-01868 (D. Ariz. Feb. 26, 2014).

116.    On or about March 28, 2014, TPT filed counterclaims against TES, alleging, among other things, that TES misappropriated TPT's trade secrets relating to turbine engine control. *See* Dkt. 15, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech.*, No. 4:14-cv-01868 (D. Ariz. Mar. 28, 2014).

117.    Specifically, in its counterclaims, TPT alleged that:

Among the many Turbine Power trade secrets TES accessed were the timing, temperatures, flow rates, horsepower settings, and pressures at which the T-53 optimally operated, all of which TES learned from Turbine Power and its engines, equipment and people.

… TES improperly and without authorization from Turbine Power incorporated into the IDEC software the foregoing trade secrets to develop the operating parameters of the TES engine control system.

*Id.* ¶¶ 51-52.

118.    On or about August 24, 2015, TES filed a motion for partial summary judgment on TPT's trade secret misappropriation counterclaim.  *See* Dkt. 89, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech.*, No. 4:14-cv-01868 (D. Ariz. Aug. 24, 2015).

119.    In its motion, TES noted that despite requests for clarification, TPT never properly identified any actual trade secret.  *Id.*

120.    On or about March 31, 2016, the Arizona court granted TES's motion for partial summary judgment.  *See* Dkt. 129, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech.*, No. 4:14-cv-01868 (D. Ariz. Mar. 31, 2016).

121.    In its order, the Arizona court held that TPT "failed to provide enough detail about the alleged trade secrets for TES or this Court to adequately discern what might be legally protectable."  *Id.* at 18-19.

122.    Based upon the foregoing, EcoStim reasonably believes that TPT does not possess any trade secrets related to turbine engine control.

123.    On or about October 12, 2016, TES and TPT settled their dispute.  *See* Dkt. 180, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech.*, No. 4:14-cv-01868 (D. Ariz. Oct. 12, 2016).

124.    On or about December 21, 2016, the case was dismissed.  *See* Dkt. 183, *Tucson Embedded Sys., Inc. v. Turbine Powered Tech.*, No. 4:14-cv-01868 (D. Ariz. Dec. 21, 2016).

### 2.    *TES Assigns Patent Rights To TPT.*

125.    Beginning in or around October 2016, TES began assigning rights in certain alleged intellectual property to TPT.

126.    As part of the settlement of their lawsuit, TES assigned certain rights in the '078 patent to TPT.

127.    One such assignment, which included the alleged trademark "CRUZFRAC" (Serial No. 85907104; Registration No. 4724316), is dated on or about May 10, 2017.

128.    On information and belief, the assignments between TES and TPT do not include the right for TPT to collect damages for past infringement.

### 3.    *TPT Goes After Competitors.*

129.    Beginning in late 2016, TPT initiated disputes over TPT's purported "intellectual property" with AZT, Crowe, and others.

130.    These disputes led to several actions in Louisiana, including: (1) one case brought by TPT in state court, which was removed to federal court in Louisiana; and (2) one case brought by AZT, Crowe, and others against TPT, MTT, and McIntyre in Louisiana federal court.

a.  TPT Files Suit in Louisiana State Court; AZT, Crowe, and Others Remove to Louisiana Federal Court.

131.  On or about November 7, 2016, TPT filed a petition against AZT, Crowe, and others in Louisiana state court.

132.  The Louisiana state court action is styled and numbered *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary.

133.  On or about June 15, 2017, the Louisiana state court heard argument on a motion.

134.  During the June 15, 2017 Louisiana state court hearing, McIntyre admitted that the purported "intellectual property" rights underlying TPT's state court action are disclosed in one or more patents. 6/15/17 Hearing Transcript at 189:25-190:10, 196:2-197:7, 212:19-214:32, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary

135.  McIntyre further agreed under oath in the June 15 hearing that the "source of [his] intellectual property is … patented" and that his alleged trade secrets are protected by patents: "[s]o that took technology that was developed in-house, trade secrets, if you will, protected by NDA's and trademarks and ultimately, the patents that we know were assigned to us and we control that was all derived from all of our work product." 6/15/17 Hearing Transcript at 189:25-190:10, 214:19-24, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary (emphasis added).

136.  According to McIntyre's own sworn testimony, the scope of Defendants' alleged "intellectual property" is so broad as to preempt an entire field of industrial enterprise that has been well-known for decades.

137.    For instance, McIntyre testified that "[t]he trade secrets are controlling turbine engines."

>    Q. Anything else? What are your trade secrets?
>
>    [Objection omitted]
>
>    [A.] The trade secrets are controlling turbine engines. Mr. Crowe alluded to the fact that he controlled the output shaft of a turbine engine.

6/15/17 Hearing Transcript at 195:28-31, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary (emphasis added).

138.    McIntyre also testified that his trade secrets are "controlling a turbine engine for hydraulic fracturing power generation."

>    Q:  … So if it's not a patent that he has misappropriated, what is the intellectual property that my client has misappropriated that forms the basis of your law suit?
>
>    A:  I just said, controlling a turbine engine for hydraulic fracturing power generation.

6/15/17 Hearing Transcript at 192:7-12, *Turbine Powered Tech., LLC v. Crowe et al.*, Case No. 130379-F, 16th Judicial District Court, Parish of St. Mary (emphasis added).

139.    But Defendants do not possess a trade secret that covers the broad, abstract concept of "controlling a turbine engine for hydraulic fracturing power generation," much less "controlling turbine engines" generally.

140.    First, these are just generic ideas that have been in use for decades.  For instance, the figure below "shows a two-shaft gas turbine powered pump unit that was placed in field service during 1966."

   


**Fig. 8.9** Two-shaft gas turbine engine driving a positive displacement pump.

G.C. Howard & C.R. Fast, HYDRAULIC FRACTURING (Henry L. Doherty Series 1970).

141.    Second, these generic ideas have been disclosed in patents purportedly owned by Defendants.  The patents that McIntyre referenced in his testimony publicly disclose these concepts—and more.  For example, as discussed herein, the '078 patent discloses the following:

> In a further example, the architecture of FIGS. 3-4 may be applied to the task of <u>digitally controlling a pump-engine assembly, and namely, a gas turbine engine and a pump</u>, where the engine drives the pump. Here, a pump-engine controller automatically determines and adjusts inputs to the pump to regulate hydraulic output of the pump to meet user-specified output characteristics despite changing loads on the pump. <u>The pump may be used for various applications, with one example being injecting fluids and/or semi-fluids into the ground during hydraulic fracturing operations.</u>

'078 patent at 16:46-55 (emphasis added), attached as Exhibit B.

142.   Defendants cannot have it both ways.  They cannot claim trade secret protection over something they admit is public—be it through a patent or otherwise.  The public disclosure of McIntyre's purported trade secrets in a patent—a patent on which he is not even listed as an inventor—erases any doubts about Defendants' trade secrets.  They simply have none.

143.   On or about June 22, 2017, AZT, Crowe, and other defendants removed the case to Louisiana federal court.

144.   The case in the removed Louisiana federal court action is styled and numbered *Turbine Powered Tech., LLC v. Crowe et al.*, No. 6:17-cv-00801 (W.D. La.).

b.   AZT, Crowe, and Others File Suit in Louisiana Federal Court.

145.   On March 13, 2017, AZT, Crowe, and others filed a complaint in the United States District Court for the Western District of Louisiana against TPT, MTT, and McIntyre.  Dkt. 1, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC*, No. 6:17-cv-00386 (W.D. La. Mar. 13, 2017).

146.   In their complaint, AZT, Crowe, and others included several causes of action, including: (1) unfair trade practices; (2) defamation; (3) unfair competition; (4) bad faith patent infringement under Arizona law; and (5) tortious interference with business expectations.  *Id.*

147.   Crowe (an inventor of the '078 patent), AZT, and others filed an amended complaint in the United States District Court for the Western District of Louisiana against TPT, MTT, and McIntyre. Dkt. 46, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC*, No. 6:17-cv-00386 (W.D. La. June 28, 2017).

148.    The amended complaint contains statements about the '078 patent that belie Defendants' allegations that EcoStim infringes the '078 patent.

149.    The amended complaint states that AZT's work with EcoStim did not "implicate[] the '078 patent in any way." *Id.* ¶ 34.

150.    The amended complaint further states that AZT's "turbine controller, 'the iTxc', … is configured around turbine-control theory that pre-dates the '078 patent by several decades." *Id.* ¶ 34.

151.    More specifically, the amended complaint explains that AZT's turbine controller, iTxc, does not contain a fundamental feature of the '078 patent and its claims: adaptable compatibility with multiple variants of gas turbine engines.   Instead, the amended complaint explains that the iTxc controllers are non-adaptive and hard-coded for use with a single type of gas turbine engine:

> The claims of the '078 are limited to digital engine controllers ("DEC") that enable compatibility with multiple different gas turbine engine variants. The claims of the '078 patent are not directed to any DEC which does not enable this multi-compatibility. … The claims of the '078 patent are limited to DECs that receive data from a gas turbine engine, and which respond to that data to improve control performance. … Arizona Turbine markets a single product that incorporates a DEC: the iTxc. The iTxc does not incorporate a DEC compatible with multiple variants of gas turbine engines. … The iTxc has no need for, and does not receive, engine-specific data, as its DEC is not multi-compatible and cannot be used with multiple variants of gas turbine engines. … The iTxc technology is limited to one engine and that engine's parameters, which is hard-coded into its DEC software. The iTxc DEC is not responsive to engine-specific data because it is designed to receive none. The iTxc is not capable of controlling a gas turbine engine it is not pre-programmed to manage.

*Id.* ¶¶ 35-36, 39-41.

152.    The amended complaint also explains that AZT's TFM software does not infringe the claims of the '078 patent because, *inter alia*, TFM is not a digital engine controller:

The claims of the '078 patent are not present in the TFM software in the following ways:

a. TFM is not a digital engine controller, nor a physical device or implement of hardware, and it is not capable of controlling a gas turbine engine.

b. TFM has no interface whatsoever with any gas turbine engine.

c. TFM receives no information from, or relevant to, the operation of a gas turbine engine.

d. TFM does not control or interact with any gas turbine engine.

e. TFM does not function as a digital engine controller.

… At no time since TPT acquired an interest in the '078 patent, did Arizona Turbine, or any of the other plaintiffs herein, market any other product that could reasonably be believed to infringe on the '078 patent.

*Id.* ¶¶ 43-44.

153.    On information and belief, the foregoing sworn statements from the amended complaint are true.  Defendants have provided EcoStim with no evidence to the contrary.

154.    AZT and Crowe's amended complaint provides ample detail about the competitive situation between AZT and McIntyre that, based on information and belief, has motivated McIntyre to accuse EcoStim of stealing TPT's "intellectual property":

McIntyre's main business is MTT, which, like Arizona Turbine, designs, engineers, and manufactures gas powered turbines for various industrial applications, but primarily in the oil & gas industry.

…TPT/MTT, as a de facto joint venture, competes directly against Arizona Turbine for valuable contracts with Eco-Stim, Inc. and other customers.

… The industrial products and applications offered by Arizona Turbine are qualitatively better and more competitive than those offered by MMT, because of the superior knowledge, skill, and technical acumen brought to Arizona Turbine by Crowe.

… The growth and future success of Arizona Turbine represents a direct threat to MTT/TPT and McIntyre. Eco-Stim, Inc. and other companies have indicated their preference to contract with Arizona Turbine rather than

MTT/TPT because of Arizona Turbine's more competitive price and superior reputation for quality.

… Because of this competitive threat, McIntyre sought to drive business away from Arizona Turbine by communicating to Arizona Turbine's customers that Arizona Turbine had violated TPT's patent, and that doing business with Arizona Turbine would expose those customers to litigation.

*Id.* ¶¶ 45-49.

### 4.   *TPT, MTT, and McIntyre Set Their Sights on EcoStim.*

155.   Not content with their efforts to stifle their competitors, Defendants began a campaign of sending false and threatening communications to EcoStim, its board, executives, employees, shareholders, and investors, with the aim of coercing EcoStim into abandoning its business relationship with AZT, along with EcoStim's concomitant investment of time and money.

156.   Since late 2016, Defendants have repeatedly made vague and false accusations that EcoStim has misappropriated TPT's "intellectual property."

157.   On information and belief, Defendants lacked a good faith basis to make the allegations described below.

### a.   McIntyre's November 10, 2016 Email.

158.   On or about November 10, 2016, McIntyre sent an email to Houston-based EcoStim officers Chris Boswell and Bobby Chapman.

159.   In his November 10, 2016, email, McIntyre falsely stated that "You mentioned having assurances from Gordon Brothers and permission from us to use the equipment should you purchase it. I can't speak for Gordon Brothers but I can say we did tell you you could operate the Frac equipment we manufactured for GFES and that has not changed as it was offered at the sale. That did not however include the use of the equipment with our patented controls for turbines in oilfield applications."

34

160.   To the contrary, on or about October 13, 2014, Holdan Hoggatt, general counsel of TPT and MTT, with McIntyre copied, provided a freedom of operation assurance on behalf of TPT to EcoStim.  A copy of that assurance is attached as Exhibit A.

161.   In that assurance, which was sent to EcoStim in Houston, TPT made the following representations:

- "To the best of our/TPT's knowledge, after diligent review and inquiry, the Equipment which Eco-Stim intends to purchase from [Gordon Brothers] is not subject to any conflicting license or right of use which would prevent Eco-Stim from using the equipment as contemplated."

- "This letter and the accompanying record proof of the statements herein should assure Eco-Stim that it may operate the equipment as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property."

162.   TPT's assurance that EcoStim can "operate the equipment as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property" placed no restraints whatsoever on the controls that EcoStim was permitted to use to operate the Green Field Equipment.  Using AZT's pump controllers—or any other pump controllers—with the Green Field Equipment is well within the ambit of "operating the equipment as [EcoStim] sees fit" and therefore falls within the scope of TPT's freedom-to-operate assurance.

163.   But Defendants' false allegations relate to turbine engine controllers, not pump controllers. The turbine engine controllers on EcoStim's Green Field Equipment are the original iDEC and "blue box" controllers that were on the equipment when EcoStim purchased it from the Sales Agent, with the involvement of McIntyre and TPT.  EcoStim's use of the original iDEC and "blue box" turbine engine controllers is subject not only to the freedom-to-operate assurance but also to the license rights EcoStim acquired as third-party beneficiary to the Equipment Purchase Agreement, because the Equipment Purchase

Agreement specifically provides that Green Field's license permitted it to sell the Green Field Equipment to third parties for use in fracking and other oil and gas field services.

164.    As Defendants know, EcoStim would not have purchased the Green Field Equipment without the freedom-to-operate assurance provided by TPT.

b.    <u>Defendants' January 13, 2017, Letter Regarding the '078 Patent and EcoStim's Unanswered Response.</u>

165.    On or about January 13, 2017, Greg Mier, counsel for TPT, sent a demand letter to "Chris Bosworth," likely intended to be Chris Boswell, EcoStim's Houston-based President and CEO.  A copy of this letter is attached as Exhibit C.

166.    Mr. Mier's January 13, 2017 letter contains the following vague or false statements:

- "TPT is a co-owner of U.S. Patent No. 9,429,078 ('the '078 patent'), relating to digital engine controllers that are compatible with turbine engines."

- "We have reason to believe that you and Eco-Stim Energy Solutions, Inc. have used, sold, offered for sale, and/or licensed digital engine controllers in your line of business."

- "We also have reason to believe that these activities constitute infringement of the '078 patent."

167.    EcoStim's counsel, Ryan M. Goudelocke, responded to Mr. Mier's January 13, 2017, letter with a February 9, 2017, letter.  A copy of this letter is attached as Exhibit D.

168.    In his February 9, 2017, letter, Mr. Goudelocke stated that, after a review of the '078 patent, its file history, and the provisional application its purports to claim priority to, he was "unable to identify any overlap between the claims of [the '078] patent and any activities undertaken by Eco-Stim."

169.    Mr. Goudelocke's February 9, 2017 letter further points out that Mr. Mier's January 13, 2017, letter fails to identify any specific claims or technology that overlap.

170.    Mr. Goudelocke's February 9, 2017, letter sought additional information, including a listing of allegedly infringed claims and a comparison of EcoStim's products to those claims.

171.    Neither Defendants nor Mr. Mier have responded to Mr. Goudelocke's February 9, 2017, letter and requests for clarification.

172.    Based upon the foregoing, Defendants know that EcoStim is not infringing the patent (*i.e.*, the '078 patent).

c.    McIntyre's January 17, 2017 Email Regarding TPT's Louisiana State Court Case.

173.    On or about January 17, 2017, McIntyre sent an email to EcoStim employees and officers, including Craig Murrin.

174.    McIntyre's January 17, 2017 email states that:

I wanted to forward you the latest in our action with regards to AZT Tech, ATS and the related parties involved with regards to our patented and proprietary IP.

175.    In his January 17, 2017 email, McIntyre falsely suggests that a Louisiana state court order relates to "patented … IP." A patent action cannot be brought in state court. 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights.").  Beyond characterizing the so-called "IP" as "patented," Mr. McIntyre did not identify the "IP" or explain its alleged "proprietary" nature.

176.    On information and belief, Defendants know that EcoStim is not infringing the patent (*i.e.*, the '078 patent) that Defendants have identified to EcoStim.

177.    Defendants know or should know that EcoStim has not misappropriated any proprietary technology from Defendants.  On information and belief, Defendants have no trade secrets related to turbine control technology.

178.    Regardless, based upon EcoStim's understanding of what Defendants claim to be proprietary, EcoStim currently does not have any reason to believe that it has had access to any proprietary information Defendants might have, such as source code, technical specifications, or design documents, relating to turbine engine controllers or pump controllers for use in hydraulic fracturing.

d.    McIntyre's May 19, 2017 Email and Notice to "Eco-Stim Environmental Solutions, Inc."

179.    On or about May 19, 2017, McIntyre sent an email with attachments, including a letter to "Management of Eco-Stim Environmental Solutions, Inc.," "Board of Directors," and "Audit Committee" at "Eco-Stim Environmental Solutions, Inc."

180.    On information and belief, McIntyre intended to direct his letter to Eco-Stim *Energy* Solutions, Inc., and not Eco-Stim *Environmental* Solutions, Inc.

181.    On information and belief, McIntyre sent this letter on behalf of himself, TPT, which is listed in the heading of the first page, and MTT.

182.    McIntyre's May 19, 2017 letter contains numerous false or misleading statements, including (grammatical errors in original):

- "From a shareholder's perspective, Mr. McIntyre is deeply disturbed by Eco-Stim's management and Board of Directors entire failure to address this essential intellectual property issue. This is not a minor issue, as this intellectually property is a prerequisite to having the legal right to deploy Eco-Stim's turbine frac fleet as upgraded by Arizona Turbine Technology and affiliates."

38

- "Eco-Stim management failed to disclose a grave Material Risk to the operations and financial well-being of Eco-Stim."

- "Eco-Stim's continues to use Turbine Powered Technology, LLC's ('TPT') proprietary controls and derivative upgrades which Arizona Turbine Technology, Inc. ('AZT') unlawfully installed in turbine powered frac equipment controls."

- "Eco-Stim's continues to use TPT's proprietary controls technology for turbine frac equipment. Specifically, the unauthorized and misappropriated technology are the upgrades to the turbine frac unit control systems, including CruzFrac."

- "Despite repeated notice, warnings, and uncontroverted evidence, Eco-Stim chose to and continues to do business with Arizona Turbine Technology to upgrade the frac equipment control systems. Arizona Turbine Technology, your vendor, has no legal right in or to the controls technology which it installed on Eco-Stim's frac equipment. TPT is the legal owner of the technology upgrades, including 'CruzFrac'."

- "Despite repeated notice, warnings, and uncontroverted evidence, Eco-Stim chose to and continues to do business with Arizona Turbine Technology to upgrade the frac equipment control systems."

- "Arizona Turbine Technology, Eco-Stim's vendor, has no legal right in or to the controls technology which it installed on Eco-Stim's frac equipment."

- "TPT is the legal owner of the technology upgrades within the oil and gas industry, including the 'CruzFrac' technology."

- "TPT has not granted any right of use, license, or other agreement to any other person or entity regarding the upgraded frac equipment controls technology for use in the oil and gas industry."

- "Despite repeated notices, Cease & Desist letter, and Court Orders, Eco-Stim continues to utilize the upgraded controls technology without a valid license or other legal right."

- "The Material Risk should have been disclosed in Eco-Stim's communications to shareholders, investors, creditors, and regulatory agencies."

- "Eco-Stim's letter in response to the Cease & Desist letter did not indicate a thorough investigation or review of this critical violation of intellectual property rights."

- "Despite TPT's best efforts to inform and warn Eco-Stim of impending action in the existing and pending intellectual property disputes, claims and actions, Eco-Stim chose to pursue a relationship with Arizona Turbine Technology,

David Crowe, Ken Braccio and their various shell companies to perform work using our patented and trademarked technology."

- "TPT, as the original designer, developer and manufacturer of Eco-Stim's turbine frac units and controls, hopes for the success of Eco-Stim. However, we can no longer allow the unauthorized usage of our patented, trademarked (e.g. CruzFrac), and proprietary technology."

183.   Defendants knew or should have known the above statements were false or misleading.

184.   Defendants know or should know that EcoStim is not infringing the patent (*i.e.*, the '078 patent) or trademark (*i.e.*, "CRUZFRAC") that Defendants have identified to EcoStim.

185.   Defendants know or should know that EcoStim has not misappropriated any proprietary technology from Defendants.  On information and belief, Defendants have no trade secrets related to turbine control technology.

186.   Regardless, based upon EcoStim's understanding of what Defendants claim to be proprietary, EcoStim currently does not have any reason to believe that it has had access to any proprietary information Defendants might have, such as source code, technical specifications, or design documents, relating to turbine engine controllers or pump controllers for use in hydraulic fracturing.

e.      McIntyre's July 18, 2017 Email.

187.   On or about July 18, 2017, McIntyre—on behalf of himself, TPT, and MTT—sent an email to Houston-based EcoStim officers Chris Boswell and Bobby Chapman, as well as other EcoStim officers and employees, investors, and lawyers.

188.   Again, McIntyre's email contains numerous false and misleading statements.

189.    McIntyre states in his July 18, 2017, email that "theft of intellectual property is a criminal offense under both state and federal law."  McIntyre did not and cannot provide any legal support for his false suggestion that EcoStim has engaged in criminal conduct by stealing Defendants' "intellectual property."

190.    McIntyre further falsely states in his July 18, 2017, email that "Eco-Stim continues to purchase goods and services derived from the theft and use of the stolen technology."

191.    To the contrary, EcoStim has not entered into any agreements with AZT to perform work on EcoStim's Green Field Equipment since its August 2015 agreement.

192.    Defendants know or should know that EcoStim is not infringing the patent (*i.e.*, the '078 patent) or trademark (*i.e.*, "CRUZFRAC") that Defendants have identified to EcoStim.

193.    Defendants know or should know that EcoStim has not misappropriated any proprietary technology from Defendants.  As discussed above, on information and belief, Defendants have no trade secrets related to turbine control technology.

194.    Regardless, based upon EcoStim's understanding of what Defendants claim to be proprietary, EcoStim currently does not have any reason to believe that it has had access to any proprietary information Defendants might have, such as source code, technical specifications, or design documents, relating to turbine engine controllers or pump controllers for use in hydraulic fracturing.

        f.    <u>McIntyre's Allegations During EcoStim Shareholder Calls.</u>

195.    On several occasions, McIntyre has attempted to participate in EcoStim shareholder calls. EcoStim believes that, if it allowed McIntyre to be heard on those calls,

he would likely repeat vague and false threats like those discussed above about his alleged patent and other purported "intellectual property" claims.

196.    Defendants know or should know that EcoStim is not infringing the patent (*i.e.*, the '078 patent) or trademark (*i.e.*, "CRUZFRAC") that Defendants have identified to EcoStim.

197.    Defendants know or should know that EcoStim has not misappropriated any proprietary technology from Defendants.  On information and belief, Defendants have no trade secrets related to turbine control technology.

198.    Regardless, based upon EcoStim's understanding of what Defendants claim to be proprietary, EcoStim currently does not have any reason to believe that it has had access to any proprietary information Defendants might have, such as source code, technical specifications, or design documents, relating to turbine engine controllers or pump controllers for use in hydraulic fracturing.

5.    *Defendants Are Attempting To Unlawfully Prevent Competition In The Marketplace.*

199.    As discussed above, TPT, MTT, and McIntyre have repeatedly sought to interrupt and derail the business of others—be it EcoStim or others.

200.    On information and belief, TPT, MTT, and McIntyre's actions and false statements have been motivated by a desire to remove competition from the market for turbine engine controls and services for hydraulic fracturing.

201.    On information and belief, TPT, MTT, and McIntyre knew or should have known that the statements discussed herein were false and/or misleading.

202.    Alternatively, TPT, MTT, and McIntyre made the statements without the appropriate degree of care for their truth or falsity, nor for the damage that such statements could do to EcoStim and others.

**I.    TPT's, MTT's, and McIntyre's Actions Have Damaged EcoStim.**

203.    As a direct result of the unlawful communications from Defendants and others acting on their behalf, EcoStim has suffered general and specific damages, including reputational damage.

204.    As a direct result of the communications from Defendants and others acting on their behalf, EcoStim has suffered lost profits, lost business opportunities, and other direct economic and non-economic damages.

205.    For instance, EcoStim has incurred the cost of purchasing diesel-powered hydraulic fracturing pumps.  EcoStim's plans to refurbish the Green Field Equipment trailers by replacing their original Lime pump controllers were suspended, due to Defendants' threats and false accusations, after only six of the twelve trailers were refurbished.  Instead of refurbishing the remaining Green Field Equipment trailers, EcoStim purchased diesel-powered hydraulic fracturing pumps, which it could retrofit with AZT technology without implicating Defendants' false allegations.

<u>**COUNT I**</u>

**(Declaration of Non-Infringement of U.S. Patent No. 9,429,078)**

206.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

207.    EcoStim has not and does not infringe, literally or under the doctrine of equivalents, any valid and enforceable claim of the '078 patent, either directly, contributorily, by inducement, jointly, or in any other manner.

208.    EcoStim does not infringe the '078 patent under 35 U.S.C. § 271, at least because it does not make, use, sell, offer to sell, or import any infringing products. Nor does EcoStim induce or contribute to others' infringement.

209.    As already discussed, the work done by AZT for EcoStim—which is ostensibly accused now—related to pump controllers.

210.    Because Defendants allege that the '078 patent relates to turbine engine controllers, EcoStim is not practicing the '078 patent based on the pump controller work done by AZT for EcoStim.

211.    Moreover, as explained in '078 patent inventor Crowe's amended complaint in Louisiana federal court, there are limitations on the '078 patent's scope that exclude the work done by AZT for EcoStim:

> b. The '078 patent does not apply to frac-pump controllers integrated with turbine controllers.
>
> c. The '078 patent does not apply to generator controllers integrated with turbine controllers.
>
> d. The '078 patent does not apply to technologies that control frac-pumps.
>
> …
>
> f. The '078 patent only applies to digital engine controls that enable compatibility with multiple gas turbine engine variants.

Dkt. 46 ¶ 25, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC et al.*, No. 6:17-cv-00386 (W.D. La. June 28, 2017).

44

212.    On information and belief, TPT, MTT, and McIntyre are and have been aware of the above-listed limitations at all relevant times.  *Id.* ¶ 27.

213.    As discussed in Crowe's amended complaint in *AZT v. TPT*, AZT's turbine engine controller technology does not infringe for numerous reasons, which EcoStim incorporates as if set forth herein.  Dkt. 46 ¶¶ 34-44, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC et al.*, No. 6:17-cv-00386 (W.D. La. June 28, 2017).

214.    As is relevant here, AZT, Crowe, and others stated in the amended complaint, regarding AZT's iTxc controller:

> The claims of the '078 are limited to digital engine controllers ("DEC") that enable compatibility with multiple different gas turbine engine variants. The claims of the '078 patent are not directed to any DEC which does not enable this multi-compatibility. … The claims of the '078 patent are limited to DECs that receive data from a gas turbine engine, and which respond to that data to improve control performance. … Arizona Turbine markets a single product that incorporates a DEC: the iTxc. The iTxc does not incorporate a DEC compatible with multiple variants of gas turbine engines. … The iTxc has no need for, and does not receive, engine-specific data, as its DEC is not multi-compatible and cannot be used with multiple variants of gas turbine engines. … The iTxc technology is limited to one engine and that engine's parameters, which is hard-coded into its DEC software. The iTxc DEC is not responsive to engine-specific data because it is designed to receive none. The iTxc is not capable of controlling a gas turbine engine it is not pre-programmed to manage.

*Id.* ¶¶ 35-36, 39-41.

215.    As is also relevant here, AZT, Crowe, and others further stated in the amended complaint, regarding AZT's TFM technology:

> The claims of the '078 patent are not present in the TFM software in the following ways:
>
> a. TFM is not a digital engine controller, nor a physical device or implement of hardware, and it is not capable of controlling a gas turbine engine.
>
> b. TFM has no interface whatsoever with any gas turbine engine.

c. TFM receives no information from, or relevant to, the operation of a gas turbine engine.

d. TFM does not control or interact with any gas turbine engine.

e. TFM does not function as a digital engine controller.

… At no time since TPT acquired and interest in the '078 patent, did Arizona Turbine, or any of the other plaintiffs herein, market any other product that could reasonably be believed to infringe on the '078 patent.

*Id.* ¶¶ 43-44.

216.    Furthermore, Defendants' claims of patent infringement are exhausted and Defendants are estopped from pursuing infringement claims due to Defendants' involvement in the sale to EcoStim of the Green Field Equipment, the use of which Defendants now falsely allege represents theft of their "intellectual property."

217.    Defendants' claims of patent infringement are further barred by the perpetual royalty-free license EcoStim obtained as a third-party beneficiary to the Equipment Purchase Agreement, because the Equipment Purchase Agreement specifically provides that Green Field's license permitted it to sell the Green Field Equipment to third parties for use in fracking and other oil and gas field services.

218.    TPT's freedom-to-operate assurance, included in Exhibit A, and the surrounding discussions among the parties, further evidences that Defendants' claims of patent infringement are exhausted and estopped.

219.    Because TPT purports to have owned the '078 patent as of November 15, 2013, the freedom-to-operate assurance covered any use of the '078 patent by EcoStim (although, as discussed herein, EcoStim does not use the '078 patent).

220.    Moreover, even if EcoStim were using the '078 patent (to be clear, it is not), such use would be licensed and/or authorized for at least three reasons.  First, such use

would be licensed and/or authorized due to the freedom-to-operate assurances and the circumstances surrounding EcoStim's purchase of the Green Field Equipment.  Second, such use would be licensed and/or authorized under the Equipment Purchase Agreement between TPT and Green Field, which specifically provided that Green Field may sell and license the Green Field Equipment to third parties, such as EcoStim, for use in oil and gas well services.  Third, such use would be licensed and/or authorized under the various Bankruptcy Court orders, including without limitation the Sale Order, which Defendants were subject to and received notice of, that conveyed the assets to EcoStim claim and encumbrance-free.

221.    Defendants are barred under the doctrine of patent misuse from enforcing the '078 patent, due to Defendants' attempts to improperly expand the scope of the '078 patent to restrain competition.  Defendants know or should know their allegations that EcoStim has infringed the '078 patent are false and that those allegations unlawfully expand the scope of the '078 patent claims.

222.    Defendants are barred from asserting the '078 patent based on the doctrine of unclean hands.

223.    Defendants are further prevented from asserting the '078 patent under the doctrine of equitable estoppel in light of their actions outlined herein, including, without limitation, providing EcoStim with the freedom-to-operate assurance attached as Exhibit A..

## COUNT II

### (Declaration of No Federal Trademark Infringement)

224.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

225.    On information and belief, TPT, MTT, and McIntyre purport to own one or more Federal trademarks.

226.    Specifically, on information and belief, TPT, MTT, and McIntyre purport to own the federal trademark "CRUZFRAC."

227.    To the best of its current knowledge, EcoStim has never used "CRUZFRAC" or any similar mark to market or otherwise designate its products and services, including those that make use of the AZT pump controllers.

228.    Because the freedom-to-operate assurance covered any use of the "CRUZFRAC" mark by EcoStim (although, as discussed herein, EcoStim does not use the "CRUZFRAC" mark), Defendants are estopped from arguing infringement.

229.    Moreover, even if EcoStim were using the "CRUZFRAC" mark (to be clear, it does not), such use would be licensed and authorized for at least three reasons. First, such use would be licensed and authorized due to the freedom-to-operate assurances and the circumstances surrounding EcoStim's purchase of the Green Field Equipment. Second, such use would be licensed and authorized under the Equipment Purchase Agreement between TPT and Green Field, which specifically provided that Green Field may sell and license the Green Field Equipment to third parties, such as EcoStim, for use in oil and gas well services.  Third, such use would be licensed and authorized under the various Bankruptcy Court orders, including without limitation the Sale Order, which Defendants were subject to and received notice of, that conveyed the assets to EcoStim claim and encumbrance-free.

230.    For at least these reasons, under 15 U.S.C. § 1125, EcoStim does not infringe any rights Defendants may hold in the purported Federal trademark "CRUZFRAC."

## COUNT III

### (Declaration of No Trade Secret Misappropriation Under the Defend Trade Secrets Act of 2016)

231.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

232.    Although as of yet undefined and unknown to EcoStim, TPT, MTT, and McIntyre have informed EcoStim that they own one or more trade secrets, which they refer to as "proprietary."

233.    Defendants claim that their alleged trade secrets relate to controller technology used for turbine engines.

234.    EcoStim believes that TPT, MTT, and McIntyre do not own any such trade secrets.

235.    Specifically, Defendants do not possess a trade secret that covers the broad, abstract concept of "controlling a turbine engine for hydraulic fracturing power generation," much less "controlling turbine engines" generally, as McIntyre has testified he believes they do.

236.    These are just generic ideas that have been in use for decades.  For instance, the figure 8.9 in G.C. Howard & C.R. Fast, HYDRAULIC FRACTURING (Henry L. Doherty Series 1970) (reproduced herein above) "shows a two-shaft gas turbine powered pump unit that was placed in field service during 1966."

237.    These generic ideas have been disclosed in patents purportedly owned by Defendants.  The patents that McIntyre referenced in his testimony publicly disclose these concepts—and more.  For example, as discussed herein, the '078 patent discloses the following:

> In a further example, the architecture of FIGS. 3-4 may be applied to the task of digitally controlling a pump-engine assembly, and namely, a gas turbine engine and a pump, where the engine drives the pump. Here, a pump-engine controller automatically determines and adjusts inputs to the pump to regulate hydraulic output of the pump to meet user-specified output characteristics despite changing loads on the pump. The pump may be used for various applications, with one example being injecting fluids and/or semi-fluids into the ground during hydraulic fracturing operations.

'078 patent at 16:46-55 (emphasis added), attached as Exhibit B.

238.    Defendants cannot have it both ways.  They cannot claim trade secret protection over something they admit is public—be it through a patent or otherwise.  The public disclosure of McIntyre's purported trade secrets in a patent—a patent on which he is not even listed as an inventor—erases any doubts about Defendants' trade secrets.  They simply have none.

239.    As discussed herein, even if Defendants were to possess trade secret information, EcoStim has not misappropriated any such information.

240.    Based upon EcoStim's understanding of what Defendants claim to be proprietary, EcoStim currently does not have any reason to believe that it has had access to any proprietary information Defendants might have, such as source code, technical specifications, or design documents, relating to turbine engine controllers or pump controllers for use in hydraulic fracturing. Nor has EcoStim obtained any such information through improper means.

241.   Regardless, Defendants have alleged in their false communications that EcoStim has been using Defendants' trade secrets after May 11, 2016.

242.   Furthermore, because the freedom-to-operate assurance covered any use of Defendants' purported trade secrets by EcoStim (although, as discussed herein, EcoStim does not know of or use any such trade secrets), Defendants are estopped from arguing misappropriation.

243.   Due to the Arizona Federal court's holding that Defendants have no trade secrets, Defendants are collaterally estopped from arguing trade secret misappropriation in this case.  *E.g.*, Dkt. 46, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC*, No. 6:17-cv-00386 (W.D. La. June 28, 2017).

244.   Moreover, even if EcoStim were using Defendants' trade secrets (to be clear, it is not), such use would be licensed and/or authorized for at least three reasons. First, such use would be licensed and/or authorized due to the freedom-to-operate assurances and the circumstances surrounding EcoStim's purchase of the Green Field Equipment.  Second, such use would be licensed and/or authorized under the Equipment Purchase Agreement between TPT and Green Field, which specifically provided that Green Field may sell and license the Green Field Equipment to third parties, such as EcoStim, for use in oil and gas well services.  Third, such use would be licensed and/or authorized under the various Bankruptcy Court orders, including without limitation the Sale Order, which Defendants were subject to and received notice of, that conveyed the assets to EcoStim claim and encumbrance-free.

245.   For at least these reasons, EcoStim has not misappropriated any trade secrets of Defendants under 18 U.S.C. § 1836.

## COUNT IV

### (Declaration of No Trade Secret Misappropriation Under TEX. CIV. PRAC. & REM. CODE § 134A)

246.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

247.    Although as of yet undefined and unknown to EcoStim, TPT, MTT, and McIntyre have informed EcoStim that they own one or more trade secrets, which they refer to as "proprietary."

248.    Defendants claim that their alleged trade secrets relate to controller technology used for turbine engines.

249.    EcoStim believes that TPT, MTT, and McIntyre do not own any such trade secrets.

250.    Specifically, Defendants do not possess a trade secret that covers the broad, abstract concept of "controlling a turbine engine for hydraulic fracturing power generation," much less "controlling turbine engines" generally, as McIntyre has testified he believes they do.

251.    These are just generic ideas that have been in use for decades.  For instance, the figure 8.9 in G.C. Howard & C.R. Fast, HYDRAULIC FRACTURING (Henry L. Doherty Series 1970) (reproduced herein above) "shows a two-shaft gas turbine powered pump unit that was placed in field service during 1966."

252.    These generic ideas have been disclosed in patents purportedly owned by Defendants.  The patents that McIntyre referenced in his testimony publicly disclose these concepts—and more.  For example, as discussed herein, the '078 patent discloses the following:

In a further example, the architecture of FIGS. 3-4 may be applied to the task of <u>digitally controlling a pump-engine assembly, and namely, a gas turbine engine and a pump</u>, where the engine drives the pump. Here, a pump-engine controller automatically determines and adjusts inputs to the pump to regulate hydraulic output of the pump to meet user-specified output characteristics despite changing loads on the pump. <u>The pump may be used for various applications, with one example being injecting fluids and/or semi-fluids into the ground during hydraulic fracturing operations</u>.

'078 patent at 16:46-55 (emphasis added), attached as Exhibit B.

253.   Defendants cannot have it both ways.  They cannot claim trade secret protection over something they admit is public—be it through a patent or otherwise.  The public disclosure of McIntyre's purported trade secrets in a patent—a patent on which he is not even listed as an inventor—erases any doubts about Defendants' trade secrets.  They simply have none.

254.   As discussed herein, even if Defendants were to possess trade secret information, EcoStim has not misappropriated any such information.

255.   Based upon EcoStim's understanding of what Defendants claim to be proprietary, EcoStim currently does not have any reason to believe that it has had access to any proprietary information Defendants might have, such as source code, technical specifications, or design documents, relating to turbine engine controllers or pump controllers for use in hydraulic fracturing. Nor has EcoStim obtained any such information through improper means.

256.   Regardless, Defendants have alleged in their false and threatening communications that EcoStim has been using Defendants' trade secrets after September 1, 2013.

257.   Furthermore, because the freedom-to-operate assurance covered any use of Defendants' purported trade secrets by EcoStim (although, as discussed herein, EcoStim

does not know of or use any such trade secrets), Defendants are estopped from arguing misappropriation.

258.    Due to the Arizona Federal court's holding that Defendants have no trade secrets, Defendants are collaterally estopped from arguing trade secret misappropriation in this case.  *E.g.*, Dkt. 46, *Arizona Turbine Tech., Inc. et al. v. Turbine Powered Tech., LLC*, No. 6:17-cv-00386 (W.D. La. June 28, 2017).

259.    Moreover, even if EcoStim were using Defendants' trade secrets (to be clear, it is not), such use would be licensed and/or authorized for at least three reasons. First, such use would be licensed and/or authorized due to the freedom-to-operate assurances and the circumstances surrounding EcoStim's purchase of the Green Field Equipment.  Second, such use would be licensed and/or authorized under the Equipment Purchase Agreement between TPT and Green Field, which specifically provided that Green Field may sell and license the Green Field Equipment to third parties, such as EcoStim, for use in oil and gas well services.  Third, such use would be licensed and/or authorized under the various Bankruptcy Court orders, including without limitation the Sale Order, which Defendants were subject to and received notice of, that conveyed the assets to EcoStim claim and encumbrance-free.

260.    For at least these reasons, EcoStim has not misappropriated any trade secrets of Defendants under TEX. CIV. PRAC. & REM. CODE § 134A.

## COUNT V

### (Breach of Contract Under State Law)

261.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

262.    As discussed herein, a contract exists between EcoStim and TPT.

263.    On information and belief, in consideration for EcoStim's purchase of the Green Field Equipment, TPT provided EcoStim with a freedom-to-operate assurance, believing that it would receive services contracts from EcoStim and a portion of the sales price as a creditor in the Green Field bankruptcy.  Exhibit A.

264.    In the freedom-to-operate assurance, TPT promised:

- "To the best of our/TPT's knowledge, after diligent review and inquiry, the Equipment which Eco-Stim intends to purchase from [the Sales Agent] is not subject to any conflicting license or right of use which would prevent Eco-Stim from using the equipment as contemplated."

- "This letter and the accompanying record proof of the statements herein should assure Eco-Stim that it may operate the equipment as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property."

265.    EcoStim has not breached the agreement. EcoStim purchased the Green Field Equipment from the Sales Agent (in reliance on TPT's representations).

266.    Without this freedom-to-operate assurance, EcoStim would not have purchased the Green Field Equipment.  In fact, EcoStim held up the purchase until it received this freedom-to-operate assurance.

267.    TPT has breached its agreement with EcoStim.  TPT has made and continues to make allegations of "intellectual property" infringement and misappropriation premised on EcoStim's use of the Green Field Equipment, despite the fact that it promised EcoStim it "may operate [such equipment] as [EcoStim] sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property."

268.    TPT's breach has caused EcoStim harm, including requiring EcoStim to hire and pay attorneys to assist EcoStim in defending EcoStim against TPT's false allegations. As a result, EcoStim is entitled to damages, preliminary and permanent injunctive relief, attorneys' fees, and costs.

## COUNT VI

### (Breach of Contract Under State Law)

269.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

270.    As discussed herein, TPT entered into the Equipment Services Agreement with Green Field pursuant to which it granted Green Field a perpetual royalty-free license and right to purchase turbine-powered hydraulic fracturing pumps.  TPT further granted Green Field the right to resell, lease, and rent the turbine-powered hydraulic fracturing pumps to third parties for use in in performing hydraulic fracturing.

271.    TPT further provided, "If this Agreement expires by its own terms or is terminated for any reason, [Green Field] will nonetheless have the right to . . . resell, lease and rent the Turbine Engines to third parties provided the use is restricted to the Well Service Business."

272.    Green Field, through the Sales Agent, sold EcoStim the Green Field Equipment that Green Field purchased from TPT pursuant to the Equipment Services Agreement.

273.    EcoStim purchased the Green Field Equipment solely for use in performing hydraulic fracturing.

274.    EcoStim is an intended third-party beneficiary of the Equipment Services Agreement, because the Equipment Purchase Agreement specifically provides that Green Field's license permitted it to sell the Green Field Equipment to third parties for use in hydraulic fracturing and other oil and gas field services.

275.    EcoStim has complied with all applicable provisions of the Equipment Services Agreement because it uses Green Field Equipment solely for hydraulic fracturing services.

276.    McIntyre and MTT are aware of the Equipment Services Agreement and EcoStim's purchase of the Green Field Equipment subject to the perpetual royalty-free license thereunder.

277.    Nevertheless, McIntyre and MTT have undertaken a willful and intentional act of interference with EcoStim's rights under the Equipment Services Agreement.

278.    TPT's breach has caused EcoStim harm, including requiring EcoStim to hire and pay attorneys to assist EcoStim in defending EcoStim against TPT's false allegations. As a result, EcoStim is entitled to damages, preliminary and permanent injunctive relief, attorneys' fees, and costs.

## COUNT VII

### (Tortious Interference with Contract Under State Law)

279.    EcoStim repeats and re-alleges the allegations in all preceding and succeeding paragraphs in this complaint as if fully set forth herein.

280.    As discussed herein, TPT entered into the Equipment Services Agreement with Green Field pursuant to which it granted Green Field a perpetual royalty-free license and right to purchase turbine-powered hydraulic fracturing pumps.  TPT further granted Green Field the right to resell, lease, and rent the turbine-powered hydraulic fracturing pumps to third parties for use in performing hydraulic fracturing.

281.    TPT further provided, "If this Agreement expires by its own terms or is terminated for any reason, [Green Field] will nonetheless have the right to . . . resell, lease

and rent the Turbine Engines to third parties provided the use is restricted to the Well Service Business."

282.    Green Field, through the Sales Agent, sold EcoStim the Green Field Equipment that Green Field purchased from TPT pursuant to the Equipment Services Agreement.

283.    EcoStim purchased the Green Field Equipment solely to for use in performing hydraulic fracturing.

284.    EcoStim is an intended third-party beneficiary of the Equipment Services Agreement, because the Equipment Purchase Agreement specifically provides that Green Field's license permitted it to sell the Green Field Equipment to third parties for use in hydraulic fracturing and other oil and gas field services.

285.    EcoStim has complied with all applicable provisions of the Equipment Services Agreement because it uses Green Field Equipment solely for hydraulic fracturing services.

286.    McIntyre and MTT were aware of TPT's obligations under the Equipment Services Agreement.  Both signed the Equipment Services Agreement as a witness.

287.    McIntyre and MTT have tortiously interfered with EcoStim's rights under the Equipment Services Agreement.  Specifically, McIntyre and MTT began a campaign of sending false and threatening communications to EcoStim, its board, executives, employees, shareholders, and investors, with the aim of coercing EcoStim into abandoning its business relationship with AZT in favor of a business relationship with TPT.

288.    McIntyre and MTT further have tortiously interfered with EcoStim's rights under the Equipment Services Agreement in that they have knowingly caused TPT to

breach that agreement.  At McIntyre's and MTT's urging, TPT has made and continues to make allegations of "intellectual property" infringement and misappropriation premised on EcoStim's use of the Green Field Equipment, despite the fact that it granted EcoStim a perpetual royalty-free license in the Green Field Equipment.

289.    McIntyre and MTT's actions were without justification.  Both knew and understood that EcoStim was granted a perpetual royalty-free license to use the Green Field Equipment, both knew that EcoStim received the freedom-to-operate assurance, and both knew that the Bankruptcy Court ordered that the assets be sold free of all claims, liens and encumbrances by virtue of their receipt of notice of the Sale Order.

290.    TPT's breach, based on McIntyre and MTT's active concert and participation, has caused EcoStim harm, including suspending plans to upgrade the remainder of the Green Field Equipment, purchasing equipment it otherwise would not have purchased, and requiring EcoStim to hire and pay attorneys to assist EcoStim in defending EcoStim against TPT's false allegations. As a result, EcoStim is entitled to damages, extraordinary damages, preliminary and permanent injunctive relief, attorneys' fees, and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, EcoStim respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.    Judgment on EcoStim's first count, declaring that none of the claims of the '078 patent are or were directly, jointly, or indirectly infringed by the use, sale, or offer for sale of any of EcoStim's services or products or any other activity attributable to EcoStim, either literally or under the doctrine of equivalents;

B.    Declaring that this case is "exceptional" within the meaning of 35 U.S.C. § 285, and that all costs and expenses of this action, including reasonable attorneys' fees, be awarded to EcoStim;

C.      Judgment on EcoStim's second count, declaring that EcoStim has not infringed any trademark of Defendants, including "CRUZFRAC";

D.      Judgment on EcoStim's third count, declaring that EcoStim has not misappropriated any trade secret of Defendants;

E.      Judgment on EcoStim's fourth count, declaring that EcoStim has not misappropriated any trade secret of Defendants;

F.      A judgment on EcoStim's fifth count, entering judgment against Defendants for the amount of damages that EcoStim proves at trial and enjoining Defendants from further violation of the law;

G.      A judgment on EcoStim's sixth count, entering judgment against Defendants for the amount of damages that EcoStim proves at trial and enjoining Defendants from further violation of the law;

H.      A judgment on EcoStim's seventh count, entering judgment against Defendants for the amount of damages that EcoStim proves at trial and enjoining Defendants from further violation of the law;

I.      Damages, including punitive or exceptional damages;

J.      Preliminary and permanent injunctions;

K.      Pre- and post-judgment interest;

L.      All costs and expenses of this action, including reasonable attorneys' fees; and

M.      All such other relief, at law or in equity, as the Court may deem appropriate and just under the circumstances.

## **DEMAND FOR JURY TRIAL**

EcoStim hereby demands a trial by jury on all issues so triable.

Dated: August 17, 2017.

M<small>C</small>K<small>OOL</small> S<small>MITH</small>, **P.C.**

/s/ *Gayle R. Klein*
Gayle R. Klein
Texas State Bar No. 00797348
gklein@mckoolsmith.com
**McKool Smith, P.C.**
One Bryant Park, 47th Floor
New York, NY 10036
Telephone: (212) 402-9400
Telecopier: (212) 402-9444

Kevin L. Burgess
Lead Attorney
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
(S.D. Tex. application to be filed)
John B. Campbell
Texas State Bar No. 24036314
jcampbell@mckoolsmith.com
(S.D. Tex. application to be filed)
James E. Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com
(S.D. Tex. application to be filed)
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

**ATTORNEYS FOR PLAINTIFF
ECO-STIM ENERGY
SOLUTIONS, INC.**